# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**KATRINA DEBOER,**
        **Plaintiff,**

    **v.**                                **Case No. 15-C-194**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the Social Security Administration**
             **Defendant.**

---

## DECISION AND ORDER

Plaintiff Katrina Deboer applied for social security disability benefits, claiming that she could not work due to a variety of impairments, including depression, anxiety, intellectual disability, fibromyalgia, neck pain, and possible multiple sclerosis. The Social Security Administration denied her application initially and on reconsideration, as did an Administrative Law Judge ("ALJ") following a hearing. The Appeals Council then declined review, making the ALJ's decision the final word from the Commissioner of Social Security on plaintiff's application. See Varga v. Colvin, 794 F.3d 809, 813 (7th Cir. 2015). Plaintiff now seeks judicial review of the ALJ's decision.

## I. FACTS AND BACKGROUND

### A.    Plaintiff's Claims

Plaintiff applied for benefits in November 2011, alleging a disability onset date of December 31, 2009. (Tr. at 188.) Twenty-eight years old at the time of her hearing before the ALJ, plaintiff's employment history was limited to brief stints as a deli worker, stocker, and fitting room attendant at Walmart; plaintiff testified that she was fired from those jobs for failing to

meet expectations. While plaintiff was able to graduate high school, she took special education classes for every subject except gym. (Tr. at 44-48, 280-84, 755-58.) She never obtained a driver's license and lived with her parents, who never left her alone (Tr. at 64), and her seven-year-old son. Plaintiff indicated that she was involved with her son's schooling, attending parent-teacher conferences, but she sometimes brought her mother or father with her because she did not understand everything. (Tr. at 50-51.)

Plaintiff testified that on a typical day she helped her son get ready for school, but he was pretty independent, picking out his own clothes, getting dressed, and brushing his teeth; plaintiff's father drove him to school or he took the bus. (Tr. at 51.) After her son went to school, plaintiff would try to do some light housework, but she had to take frequent breaks due to exhaustion. Sometimes, she slept from 8 a.m. to 3:00 p.m. (Tr. at 57.) She otherwise spent her time watching TV, playing card games, and using a computer. (Tr. at 52-53.)

Plaintiff testified that she had one friend but had not seen her in about two years; they talked on the phone once per month. She did not "go out like normal people." (Tr. at 53.) If she went grocery shopping, she used an electric cart; sometimes her father or son would help put things in the cart; lifting a gallon of milk was a struggle. Plaintiff had a boyfriend but they mostly hung around the house and watched movies. (Tr. at 53-54.)

Plaintiff indicated that her short-term memory was horrible; she needed somebody with her to remember appointments and conferences. Her ability to focus and concentrate was also poor. (Tr. at 67.) Plaintiff further testified that she could not read a newspaper; she did read to her son, but the books were at a kindergarten level. She also denied being able to write comprehensible sentences (Tr. at 69); her aunt helped her fill out the social security reports (Tr at 71-72). She could do very simple addition and subtraction but not multiplication and division.

She could not make change (Tr. at 69), and she did not go to the store by herself (Tr. at 70).

## B.    Medical Treatment

In 2010 and 2011, plaintiff saw numerous medical providers, who struggled to identify the cause of her symptoms of fatigue, pain, and lack of concentration.  Dr. Subbanna Jayaprakash, a physiatrist, initially assessed a cervical myofascial injury (Tr. at 435), referring plaintiff for physical therapy (Tr. at 431) and providing muscle relaxants (Tr. at 427).  Dr. Richard Clark, plaintiff's primary physician, suspected fibromyalgia (Tr. at 409), but he later noted that plaintiff's symptoms seemed to change from visit to visit (Tr. at 396); at times, she had multiple complaints that did not necessarily corroborate with her physical exam (Tr. at 383). Dr. Thomas Murphy, a rheumatologist, assessed fibromyalgia too, "one of the worst cases [he had] ever seen" (Tr. at 313), but he also noted multiple somatic complaints and "definite components of underlying psychiatric issues as well."  (Tr. at 313.)  Dr. Traci Purath, a headache specialist, ordered a brain MRI (Tr. at 320), which revealed lesions possibly indicative of multiple sclerosis, although atypical in appearance (Tr. at 289).  On review of the MRI, Dr. Jayaprakash assessed possible multiple sclerosis (Tr. at 375), but a subsequent lumbar puncture test for demyelinating disease came back normal (Tr. at 310, 464, 578).  Dr. Linga Reddy, a neurologst, found plaintiff's complaints likely secondary to chronic pain syndrome with a significant component of functional overlay.  Dr. Reddy declined to make a diagnosis of fibromyalgia because plaintiff's symptoms were not occurring bilaterally. (Tr. at 301.)

In the fall of 2011, Dr. Murphy prescribed Lexapro for depression and Lyrica for fibromyalgia.  (Tr. at 364.)  However, plaintiff later reported that the Lyrica did not help, and Dr. Murphy characterized her as "very noncompliant," unwilling to take "any ownership of the

3

disease process." (Tr. at 349.)

In January 2012, Dr. Jayaprakash noted that the nature of plaintiff's neurological dysfunction had not been established. He suspected that she probably had multiple sclerosis, but her spinal fluid tests were essentially negative. (Tr. at 491.) Dr. Jayaprakash assessed neuro-degenerative disorder, likely multiple sclerosis; dysautonomia with dizziness; and autoimmune dysfunction, possibly rheumatoid arthritis. (Tr. at 492.) Plaintiff also saw Dr. Byung Park, a neurologist, who ordered a follow up MRI of the brain (Tr. at 494), which showed no change from the previous scan from September 2011 (Tr. at 488). Dr. Park noted that they had essentially worked her up completely for her abnormal MRI of the brain; per mutual agreement, they elected to watch her further clinically for now. (Tr. at 652.) Dr. Clark noted that at this stage the studies did not seem to point to MS, although it was possible at some point plaintiff may be diagnosed with that condition. (Tr. at 496.) In February 2012, Dr. Reddy concurred that it was unlikely plaintiff had MS. (Tr. at 562.)

In April 2012, plaintiff reported an MS attack to Dr. Clark; he noted that she had undergone extensive neurological evaluation which did not seem to confirm MS, but in her mind she believed it might be present. (Tr. at 609.) Later that month, Dr. Park noted that the exact etiology of the white matter shown on the MRIs was still undetermined despite extensive evaluation. (Tr. at 645.) During an August 2012 emergency room visit plaintiff again reported an MS flare-up (Tr. at 736), but a repeat brain MRI showed stable white matter disease (Tr. at 751).

In October 2012, Dr. Jayaprakash completed a functional capacity questionnaire, indicating that he had seen plaintiff since April 2010 for neuro-degenerative disorder/MS. (Tr. at 659.) He listed symptoms of fatigue, weakness, and autonomic dysfunction, with a poor to

4

fair prognosis, and clinical findings of weakness, hyper-reflexia, and mixed connective tissue disorder. (Tr. at 659.) He opined that pain would constantly interfere with plaintiff's attention and concentration, and that she was incapable of even low stress jobs. Exertionally, she could walk less than one block, sit 10-15 minutes, and stand 10-15 minutes. (Tr. at 660.) In an eight-hour day, she could sit and stand/walk less than two hours each. She needed a job that allowed shifting positions at will from sitting to standing and would need four to eight unscheduled breaks during an eight-hour day. She also needed to use a cane with occasional standing and walking. She could rarely lift less than 10 pounds, never more. (Tr. at 661.) She could never twist, crouch, or climb ladders or stairs, and rarely stoop. She could use her hands for repetitive activities just 30% of the day. Finally, she would have good and bad days causing more than four absences per month. (Tr. at 662.)

Between October 2012 and June 2013, plaintiff underwent various testing, including bilateral wrist x-rays (Tr. at 726), a lymph node needle biopsy (Tr. at 720), a liver ultrasound (Tr. at 693), cervical and thoracic MRI scans (Tr. at 690-91), a visual evoked potential study (Tr. at 688), an echocardiogram (Tr. at 809), an EMG and nerve conduction study (Tr. at 819), and a right upper quadrant ultrasound (Tr. at 686), which were essentially negative, aside from evidence of mild left carpal tunnel syndrome (Tr. at 819). In August 2013, plaintiff saw Dr. Mohammad Qadeer regarding abnormal liver function tests (Tr. at 764), and a liver biopsy revealed minimal chronic hepatitis (Tr. at 681, 760-61). However, given the absence of liver-specific symptoms, Dr. Qadeer concluded that she did not need any therapy. (Tr. at 774.)

In September 2013, plaintiff underwent a repeat brain MRI, which again showed multiple white matter lesions; the majority appeared stable, one slightly larger. The radiologist indicated the lesions were in an atypical location for multiple sclerosis. (Tr. at 678.) Later that month,

5

plaintiff returned to Dr. Park for followup, stating that she felt weaker all over the body and still had constant pain and paresthesia involving the whole body. (Tr. at 768.) However, examination revealed normal muscle strength and tone. Dr. Park assessed abnormal MRI of the brain showing multiple white matter lesions, stable on followup MRI, exact cause still undetermined; complaints of constant pain and paresthesia, more so on the right side, etiology still unclear; and fibromyalgia. (Tr. at 770.)

## C. Agency Consultants

After plaintiff filed her application for benefits, the agency obtained reports and evaluations from several consultants. On February 3, 2012, Kalpana Rao, Ph.D., conducted a mental status evaluation, diagnosing major depression, singe episode, moderate; panic disorder; rule out learning disability; and personality disorder with histrionic features; with a current GAF of 60.[1] (Tr. at 512.) Regarding plaintiff's work capacity, Dr. Rao concluded:

> Based on the present evaluation, it is this examiner's impression that the claimant does display some difficulty with her cognitive capacities that could be affecting her ability to sustain gainful employment. Claimant appears to be having some difficulty with short term memory processes and concentration abilities. This can affect her ability to maintain concentration, attention and be goal oriented in work related situations. She also may be having difficulty with her ability to remember, process and carry out instructions. Her insight and judgment is good. Her ability for conceptual understanding and logical deduction is quite impressive. The performance pattern on the mental capacity subtest is suggestive of possible learning difficulty. She appears to be handling situations that require more hands on learning and execution. She may be having difficulty

---

[1]GAF ("Global Assessment of Functioning") rates the severity of a person's symptoms and her overall level of functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. Scores of 81-90 reflect "minimal" symptoms, 71-80 "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, and 41-50 "severe" symptoms. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

6

being involved in tasks that involve[] calculation and concentration. She indicates that she worked as a sales associate in Walmart in the past. Her ability to maintain persistence and pace required to function effectively in the work force appears to be more related to her reported fibromyalgia which [may] need further evaluation. Claimant indicates that she had [a] severe case of rheumatoid arthritis along with the multiple sclerosis. Her medical records do not indicate such a diagnosis. Her reported chronic pain problems appeared to be somewhat amplified in her narration due to her histrionic personality predisposition. Somatoform disorder however is not warranted. Secondary reinforcement, like family support, may be present which prompts her to depict a picture with more chronic disabilities than what she in fact may be experiencing. Claimant appears to have been under the care of several providers which also can create a confusing medical profile complicating any clear diagnosis. Her personality disposition with some histrionic features may also be contributing to this. Her ability to respond appropriately to interpersonal situations at work with supervisors, coworkers and customers appears to be nonproblematic. Her motivational history and persistence in general appears to be adequate. Her ability to adapt to change is limited at this time. She is under psychiatric care with some good symptom control.

(Tr. at 512-13.) Dr. Rao further recommended that, if awarded benefits, plaintiff have a payee manage her funds. (Tr. at 513.)

On February 29, 2012, Edmund Musholt, Ph.D., completed a psychiatric report based on a review of the record, evaluating plaintiff under Listings 12.04 (affective disorders), 12.06 (anxiety-related disorders), and 12.08 (personality disorders). (Tr. at 538.) He assessed mild restriction of activities of daily living; no difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 548.) In an accompanying mental residual functional capacity ("RFC") report, Dr. Musholt found moderate limitations in plaintiff's ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; complete a normal workday without interruptions from psychologically based symptoms; and respond appropriately to changes in the work setting. (Tr. at 534-35.) Dr. Musholt concluded that

7

plaintiff was capable of meeting the demands of simple routine work. (Tr. at 536.)

In March 2012, Syd Foster, D.O., completed a physical RFC report based on a record review, finding plaintiff capable of sedentary work. (Tr. at 552-59.) In August 2012, Mina Khorshidi, M.D., completed a physical RFC report, finding plaintiff capable of light work with occasional climbing of ladders, ropes and scaffolds, and avoidance of concentrated exposure to irritants and even moderate exposure to hazards. (Tr. at 98-99.)

In August 2012, psychological consultant Esther Lefevre, Ph.D., evaluated plaintiff under Listings 12.04, 12.06, and 12.08, finding moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 96.) In a mental RFC report, Dr. Lefevre found moderate limitations in plaintiff's ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and complete a normal workday without interruptions from psychologically based symptoms. (Tr. at 100.) She further found moderate limitations in plaintiff's ability to interact with the general public, respond appropriately to criticism from supervisors, and respond to changes in the work setting. (Tr. at 101.)

Finally, on July 20, 2013, Gregory Rudolph, Ph.D., conducted a mental status evaluation and intellectual assessment. Plaintiff reported that she was disabled because of learning problems, medical concerns, anxiety, and depression. Her mood level reflected some depression, but she was able to smile on occasion. Receptively, she had no difficulty understanding what was said to her, and expressively she was able to speak in sentences, with no articulation problems noted; her thoughts were relevant, and she was coherent. (Tr. at 669.) Adaptively, she was able to care for her basic needs but more advanced adaptive skills were

8

limited. She did not drive, and when shopping trusted that she got the right amount of money back. She could cook simple things. She did not have any friends, and typically stayed home and watched television. (Tr. at 670.) She was oriented to reality, and her memory for recent as well as more distant information was appropriate. She was able to recall five digits forward and two backward. Her knowledge of information was adequate. She was able to perform simple arithmetic calculations (addition and subtraction) but not simple multiplication. She could not calculate change from a purchase. (Tr. at 671.) On testing, she had a full scale IQ score of 66, placing her in the mild mentally handicapped range with borderline capability as indicated on her perceptual reasoning index score of 75. (Tr. at 671-72.) Dr. Rudolph found that she put forth good effort, and the evaluation appeared to be valid and commensurate with her level of adaptive functioning and educational placement. Given her age, educational history, and other documentation, Dr. Rudolph concluded that plaintiff's deficits in the learning skill areas were initially manifested during the developmental period before age 22. (Tr. at 672.) Dr. Rudolph diagnosed learning disorder, major depression, anxiety disorder with panic, and mental retardation to borderline capability, with a GAF of 45. He concluded that plaintiff was not capable of managing her own finances, and that her ability to obtain and maintain gainful employment was limited due to her cognitive/intellectual limitations, depression, anxiety, and medical concerns. (Tr. at 673.)

In a July 22, 2013, medical source statement, Dr. Rudolph found mild limitation in plaintiff's ability to understand and remember simple instructions; marked limitation in her ability to carry out simple instructions; mild to marked limitation in her ability to maintain attention and concentration for simple, routine, repetitive tasks; marked limitation in her ability to understand, remember, and carry out complex instructions; and moderate limitation her ability to make

9

judgments on complex work-related decisions. (Tr. at 674.) He further found mild to moderate limitation in her ability to interact appropriately with the public, mild to moderate limitation in her ability to interact appropriately with supervisors, mild to moderate limitation in her ability to interact appropriately with coworkers, and moderate limitation in her ability to respond appropriately to work stress and changes in the routine work setting. (Tr. at 674-75.) He further opined that she would due to her impairments be off task about 25% of the workday, would require 10 unscheduled breaks during an eight-hour workday, and would be absent from work more than four days per month. Finally, he opined that she had moderate limitations in activities of daily living; social functioning; and concentration, persistence, and pace; and had experienced three episodes of decompensation. (Tr. at 675.)

## D. ALJ's Decision

Following the familiar five-step evaluation process,[2] the ALJ concluded that plaintiff had not engaged in substantial gainful activity since the alleged onset date, and that she suffered from the severe impairments of fibromyalgia, major depressive disorder, and panic disorder. (Tr. at 13.) The ALJ found non-severe plaintiff's carpal tunnel syndrome, based on the benign clinical findings and electrodiagnostic testing showing a mild condition; hepatitis, as her treating provider observed no liver-specific symptoms; and neck pain, as diagnostic and clinical findings had been relatively good. (Tr. at 14.)

Based on her complaints of constant, diffuse pain and paresthesia, headaches and

---

[2]Under this process, the ALJ determines (1) whether the claimant is currently working, i.e., engaging in "substantial gainful activity"; (2) if not, whether she suffers from a severe impairment or impairments; (3) if so, whether any of those impairments are conclusively disabling under the agency's Listings; (4) if not, whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work; and (5) if not, whether she can make the adjustment to other work in the economy. See 20 C.F.R. § 404.1520(a)(4).

10

dizziness, plaintiff believed she had multiple sclerosis, but the ALJ found that the medical records belied this belief. The ALJ noted that early medical records reflected a possible diagnosis of MS based on findings of white matter on MRIs. However, upon review of serial MRIs, immunologic studies, and clinical findings treating providers had rejected that diagnosis. (Tr. at 14.)

The ALJ next determined that none of plaintiff's impairments met or medically equaled a Listing, specifically considering plaintiff's fibromyalgia under Listings 14.06 and 1.01, and her depression and panic disorders under Listings 12.04 and 12.06. (Tr. at 16.) Regarding the latter Listings, the ALJ found mild restriction of activities of daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence, and pace; and no episodes of decompensation. (Tr. at 16-18.) The ALJ did not discuss Listing 12.05, pertaining to intellectual disabilities.

The ALJ next found that plaintiff retained the RFC to perform light work, except occasional climbing of ladders, ropes, or scaffolds. She also had to avoid concentrated exposure to irritants such as fumes, odors, and dust, as well as moderate exposure to moving machinery and protected heights. She was further limited to unskilled work performing simple, routine, and repetitive tasks and was allowed off task 5% of the workday in addition to regular breaks. She could have no interaction with the public as part of her job duties. Finally, she was restricted to work that could be performed at a flexible work pace. (Tr. at 18.)

In making this finding, the ALJ considered plaintiff's claims regarding the nature and severity of her symptoms. (Tr. at 18-19.) The ALJ found plaintiff's statements "not entirely credible," noting that the medical records failed to fully substantiate her allegations of disabling symptoms, and the medical records reflected a capacity for work within the assigned residual

11

functional capacity. (Tr. at 19.) The ALJ concluded that the RFC accommodated plaintiff's fibromyalgia by limiting her to light work with avoidance of heights and hazards (due to her reports of falls and dizziness), and her mental impairments by limiting her to unskilled work, allowing her to be off task 5% of the workday (due to pain and mental limitations), performed at a flexible pace, and involving no interaction with the public. (Tr. at 21.)

The ALJ also considered the medical opinion evidence, crediting Dr. Khorshidi's report finding plaintiff capable of light work, as that report was consistent with the objective medical evidence showing reasonably good musculoskeletal and neurological function, intact coordination, strength, tone, and reflexes. (Tr. at 21.) The ALJ also credited Dr. Musholt's opinion that plaintiff could perform simple, routine work, as that report was consistent with the observations of plaintiff's treating providers and plaintiff's activities showing reasonably good mental and social functioning. (Tr. at 21-22.) The ALJ gave partial weight to Dr. Lefevre's report, crediting her finding of moderate limitations in concentration, persistence, and pace. However, the ALJ rejected Dr. Lefevre's findings of moderate limitations in daily activities and social functioning because they conflicted with plaintiff's wide-ranging activities and with the observations of examining and treating sources. (Tr. at 22.) The ALJ also gave some weight to Dr. Rao's opinion, including the GAF score indicative of moderate to minimal symptoms. Dr. Rao also found that plaintiff would be capable of interacting with co-workers and supervisors, which was supported by treating and examining notes showing her able to maintain eye contact, establish rapport, be pleasant, and engage in meaningful conversation. Plaintiff's ability to persist was also demonstrated by her ability to engage in a wide range of activities (caring for her son, playing video games, using a computer, preparing simple meals, doing light household chores). Dr. Rao did opine that plaintiff had limited ability to adapt to change and

12

reported that plaintiff displayed some difficulty in her ability to maintain concentration and attention and be goal-directed in work-related situations. Dr. Rao further noted that plaintiff might have difficulty remembering, processing, and carrying out instructions. The ALJ found that the RFC accommodated these considerations by limiting plaintiff to unskilled work with simple, routine, and repetitive tasks that could be performed at a flexible work pace. (Tr. at 22.) The ALJ gave little weight to Dr. Rudolph's opinion, finding that it conflicted with the other evidence of record. (Tr. at 23.) The ALJ also gave little weight to the report from treating provider Dr. Jayaprakash, as it found no support in the physical examinations and was based, in part, on the tentative diagnosis of multiple sclerosis later refuted by other treating providers. (Tr. at 23.)

Given her limited employment history, plaintiff had no past relevant work. The ALJ accordingly proceeded to the final step of the analysis, finding that there were other jobs plaintiff could perform, including cleaner, mail clerk, and food preparer. [3] (Tr. at 24.) The ALJ accordingly found plaintiff not disabled. (Tr. at 25.)

## II. DISCUSSION

Plaintiff argues that the ALJ erred by failing to consider whether her intellectual disability met Listing 12.05(C), in assessing her credibility, and by rejecting Dr. Jayaprakash's opinion. I address each argument in turn.

### A.    Listing 12.05

At step three, the ALJ should discuss the applicable Listings by name and offer more than a perfunctory analysis of why the claimant does not meet them. See, e.g., Minnick v.

---

[3]In making this finding, the ALJ relied on the testimony of the vocational expert summoned to plaintiff's hearing. (Tr. at 75-76.)

13

Colvin, 775 F.3d 929, 935 (7th Cir. 2015); Brindisi ex rel. Brindisi v. Barnhart, 315 F.3d 783, 786 (7th Cir. 2003). Here, the ALJ discussed the Listings related to plaintiff's fibromyalgia (14.06 and 1.01), depression (12.04), and anxiety (12.06), but he said nothing about Listing 12.05, which applies to intellectual disabilities, despite the fact that plaintiff's counsel argued its applicability at the hearing. (Tr. at 43.)

The claimant bears the burden of showing that she meets a Listing. See, e.g., Ribaudo v. Barnhart, 458 F.3d 580, 583 (7th Cir. 2006). In order to meeting Listing 12.05(C), plaintiff must show (1) deficits in adaptive functioning before age 22, (2) a valid IQ score of 60 through 70, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. Charette v. Astrue, 508 Fed. Appx. 551, 553 (7th Cir. 2013) (citing 20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05(C)). The record contains evidence supporting each of these elements. Dr. Rudolph found that plaintiff had a full scale IQ score of 66 (Tr. at 671), and that based on her age, educational history, and other information, her deficits initially manifested during the developmental period before age 22 (Tr. at 672). Finally, the ALJ found that plaintiff suffered from other impairments, including fibromyalgia, depression, and panic disorder, which caused more than minimal effects on plaintiff's ability to perform basic work activities. (Tr. at 13.)

The Commissioner responds that, because the ALJ rejected Dr. Rudolph's IQ finding, he did not need to analyze plaintiff's impairment under Listing 12.05. See Strunk v. Heckler, 732 F.2d 1357, 1360-61 (7th Cir. 1984) (affirming ALJ's rejection of IQ score where the record contained conflicting evidence). Alternatively, the Commissioner argues that any error in not discussing Listing 12.05 was harmless; because the ALJ did not find the IQ testing reliable (and accordingly declined to find plaintiff's alleged intellectual disability a medically determinable

14

impairment), there is no reason to believe he would have come to a different conclusion had be explicitly discussed Listing 12.05(C).

The problem with the Commissioner's argument is that while the ALJ took issue with Dr. Rudolph's assessment of plaintiff's functioning, he made no finding that the IQ test results were invalid or that plaintiff's alleged intellectual disability was not a medically determinable impairment.[4] See, e.g., Kastner v. Astrue, 697 F.3d 642, 648 (7th Cir. 2012) (holding that the Commissioner's lawyers cannot defendant the ALJ's decision on grounds the ALJ did not embrace). Nor does the evidence the ALJ cited necessarily support such a conclusion. In considering Dr. Rudolph's report, the ALJ stated:

> The undersigned gives little weight to the opinion of examiner Dr. Rudolph. Dr. Rudolph diagnosed the claimant with learning disability and mild mental retardation to borderline intellectual functioning. On the Wechsler Adult Intelligence Scale-IV, the claimant obtained the following scores: verbal comprehension index, 68; working memory index, 69; perceptual reasoning index, 75; processing speed index, 74; and full scale IQ, 66. Dr. Rudolph opined the claimant had the mental capacity to care for her basic needs but exhibited difficulty with performing more advanced adaptive skills. He assigned her a GAF score of 45 and opined she is not capable of maintaining gainful employment and managing her own resources. He further assigned her marked limitations in her ability to carry out even simple instructions and opined that she would be off task 25% of the workday, would be absent more than four days per month due to her mental health impairment, and that she has moderate limitations in all "paragraph B" criteria and has experienced three episodes of decompensation.
>
> Dr. Rudolph's extreme assessment . . . conflicts with all other evidence of record. As to her intellectual functioning, the claimant participated in special education while in school, but she did graduate from high school. Further, there is no indication that she could not handle the intellectual demands of working a deli counter. Significantly, other examinations show normal speech and comprehension, naming and repetition, memory, attention and concentration, fund of knowledge, ability to perform minor calculations and normal reading. Indeed, Dr. Rao observed that the claimant's capacity for conceptual understanding and logical deduction were quite impressive and that she could

---

[4]The ALJ did not discuss plaintiff's intellectual disability at step two or step three.

15

perform a simple, three-step command. Further, as to her functioning, the claimant engages in a wide range of activities requiring good intellect, social and mental function[;] she plays video games, helps her son with his homework, uses a computer, participates in the care of her son, and cooks simple meals.

(Tr. at 23, internal record citations omitted.)

A claimant's graduation from high school does not preclude a finding of intellectual disability, see, e.g., Muntzert v. Astrue, 502 F. Supp. 2d 1148, 1158 (D. Kan. 2007) (collecting cases), particularly where, as here, she did so through special education classes, see, e.g., Dragon v. Commissioner of Social Sec., 470 Fed. Appx. 454, 463 (6th Cir. 2012). Nor do periods of employment, such as plaintiff's brief stint working at the deli counter. See Muntzert, 502 F. Supp. 2d at 1158 (collecting cases). The ALJ never explained how plaintiff's duties in that job undercut a claim of intellectual disability. Plaintiff testified the job was quite basic; she waited on customers, cut meat, and washed up. She did not have to determine how much the meat cost; she weighed it on a digital scale, pushed a button, and a price tag printed out. (Tr. at 49.)

Moreover, as the Munzert court noted, Listing 12.05(C) "implies that such an individual will be able to work unless [s]he has, or until [s]he develops, a severe physical or additional mental impairment." Id. Here, plaintiff testified that she got fired from her deli counter job because she could not meet expectations: she found it hard to pick up the meat, wash the floors and dishes, and keep up with the pace. (Tr. at 48.) Her employer offered to modify her duties, but then she started experiencing panic attacks. (Tr. at 49.) As indicated, the ALJ found plaintiff's fibromyalgia and anxiety disorder to be severe impairments.

The ALJ cited other examinations showing normal speech and comprehension, memory, attention and concentration, fund of knowledge, ability to perform minor calculations, and

16

normal reading. (Tr. at 23.) However, he cited no contrary intelligence testing. In Strunk, the case upon which the Commissioner relies, the ALJ rejected one doctor's IQ score of 65, noting that another doctor came up with a score of 80-85, while a third doctor found that the claimant's answers to questions testing her fund of knowledge reflected "deliberate fabrication." 732 F.2d at 1360. The record contains no similar evidence here. The ALJ culled from Dr. Rao's report findings that plaintiff's capacity for conceptual understanding and logical deduction were quite impressive, and that plaintiff could perform a simple three-step command. (Tr. at 23.) However, Dr. Rao also stated that plaintiff "does display some difficulty with her cognitive capacities that could be affecting her ability to sustain gainful employment. . . . The performance pattern on the mental capacity subtest is suggestive of possible learning difficulty." (Tr. at 512.) Notably, Dr. Rao agreed with Dr. Rudolph's recommendation that, if awarded benefits, plaintiff have a payee manage her funds. (Tr. at 513.) An ALJ may not pick and discuss only that evidence supporting his conclusion, ignoring evidence that cuts the other way. E.g., Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010).

Finally, to the extent that the ALJ believed plaintiff's daily activities undercut a claim of intellectual disability, he failed to explain how that was so. Plaintiff participated in the care of her son, then in grade school, and helped him with his homework. But she also testified that her parents, with whom she lived, helped. See Dragon, 470 Fed. Appx. at 463 (rejecting ALJ's conclusion that the claimant was not intellectually disabled because she was a mother, where she always lived with another parental figure). For instance, plaintiff would bring her mother or father to parent-teacher conferences because she did not understand everything. She also testified that her son was quite independent in getting himself ready for school. (Tr. at 51.) She read her son books, but they were at the kindergarten to pre-school level. (Tr. at 69.) The

17

ALJ did not elaborate on what sort of video games plaintiff played or how her computer use suggested greater functioning. At the hearing, plaintiff testified that she was on Facebook, and that the amount of time she spent on the computer varied. (Tr. at 53.) She did not mention using the computer for more intricate tasks. In her reports, plaintiff wrote that she made her son lunch once per week (Tr. at 234, 256), but it is hard to see how that undercuts a claim under Listing 12.05(C). The Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013) (collecting cases); see also Gentle v. Barnhart, 430 F.3d 865, 867 (7th Cir. 2005) ("Gentle must take care of her children, or else abandon them to foster care or perhaps her sister, and the choice may impel her to heroic efforts.").

The matter must be remanded so that the ALJ may specifically consider whether plaintiff's alleged intellectual disability constitutes a severe, medically determinable impairment, and, if so, whether it meets Listing 12.05.

**B. Credibility**

The ALJ must follow a two-step process in evaluating the credibility of a claimant's statements about her symptoms. SSR 96-7p, 1996 SSR LEXIS 4, at *5. First, the ALJ must determine whether the claimant suffers from an underlying medically determinable impairment or impairments that could reasonably be expected to produce the symptoms alleged. If not, the symptoms cannot be found to affect the claimant's ability to do basic work activities. Id.

Second, if an underlying impairment that could reasonably be expected to produce the symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit her ability to do

18

basic work activities.  Id. at *5-6.  At this step, the ALJ may not discount the claimant's statements just because they lack support in the objective medical evidence.  E.g., Pierce v. Colvin, 739 F.3d 1046, 1049-50 (7th Cir. 2014).  Rather, the ALJ must make a finding on the credibility of the claimant's statements based on the entire case record, considering the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p, 1996 SSR LEXIS 4, at *8.

The ALJ must then provide "specific reasons" for his credibility determination, supported by the evidence and articulated in the decision.  Id. at *3.  So long as the ALJ substantially complies with these requirements, the court will review his credibility determination deferentially, reversing only if it is "patently wrong."  See, e.g., Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008).  However, where the credibility determination rests on objective factors rather than subjective considerations such as demeanor, the court has greater freedom to review the ALJ's decision.  See id.

In the present case, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.  First, the medical records fail to substantiate fully the claimant's

19

allegations of disabling symptoms.  Second, the medical records reflect a capacity for work within the assigned residual functional capacity.

(Tr. at 19.)

The first reason falters as a matter of law.  While an "ALJ may discount subjective complaints of pain that are inconsistent with the evidence as a whole," he "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence."  Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995).  The second reason backwardly "implies that ability to work is determined first and is then used to determine the claimant's credibility."  Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012).  Rather than initially determining whether the claimant can work and then comparing the claimant's testimony to that determination (effectively forcing the testimony into a foregone conclusion, Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012)), the "testimony should be an input into a determination of ability to work."  Goins v. Colvin, 764 F.3d 677, 681 (7th Cir. 2014).

Later in his decision, the ALJ noted that physical examinations reflected reasonably good neurological and musculoskeletal function; plaintiff's treating providers noted her non-compliance with recommended treatment and the underlying psychiatric component to her pain; plaintiff received limited mental health treatment; and plaintiff's activities suggested a capacity for work.  (Tr. at 20-21.)  To the extent that the ALJ intended these observations to bolster the credibility determination, they failed to do so.

First, the ALJ found that plaintiff suffers from fibromyalgia, the symptoms of which are "entirely subjective."  Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996).  Normal musculoskeletal and neurological exams do not necessarily diminish the severity of a claimant's fibromyalgia.  See id. at 307.

20

Second, a claimant should not be found incredible simply because the source of her pain is psychological rather than physical.  "Pain is always subjective in the sense of being experienced in the brain.  The question whether the experience is more acute because of a psychiatric condition is different from the question whether the applicant is pretending to experience pain, or more pain than she actually feels."  Carradine v. Barnhart, 360 F.3d 751, 754 (7th Cir. 2004).

Third, while an ALJ may consider a claimant's non-compliance, e.g., Castile v. Astrue, 617 F.3d 923, 930 (7th Cir. 2010), he should not draw inferences from sparse treatment or failure to follow a treatment plan without exploring any explanations therefore.  See, e.g., Pierce, 739 F.3d at 1050; Craft, 539 F.3d at 679.  In this case, for instance, while plaintiff's doctors recommended she exercise, she testified that her lack of balance and strength prevented her from doing so.

Finally, while an ALJ may also consider a claimant's daily activities, this must be done with care.  Roddy, 705 F.3d at 639.  "The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."  Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006).  Moreover, the activities the ALJ cited here – folding laundry, performing simple math, watching movies, light cleaning, participating in the care of her son, attending church services, talking to her friend on the phone once per month, grocery shopping with others, using a computer, and playing card games – are the sort of minimal daily activities courts have found do not suggest an ability to work.  See, e.g., Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) ("While the ALJ did list Zurawski's daily activities, those activities are fairly restricted (e.g., washing dishes, helping his children prepare for school, doing laundry, and preparing

21

dinner) and not of a sort that necessarily undermines or contradicts a claim of disabling pain."); Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000) (finding that "minimal daily activities" such as cooking simple meals, vacuuming, grocery shopping, walking for exercise, and playing cards "do not establish that a person is capable of engaging in substantial physical activity"); Mason v. Barnhart, 325 F. Supp. 2d 885, 903-04 (E.D. Wis. 2004) (finding that activities including shopping, watching TV, cooking easy things, attending church, and talking on the phone did not undermine credibility). Nor did the ALJ explain how any of these activities undercut plaintiff's claims about her symptoms and limitations. See Jelinek v. Astrue, 662 F.3d 805, 812 (7th Cir. 2011) ("ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence.").

Therefore, the matter must also be remanded to reconsideration of plaintiff's credibility.

## C. Dr. Jayaprakash's Report

The ALJ must give "controlling weight" to the opinion of a claimant's treating doctor if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence. 20 C.F.R. § 404.1527(c). If the ALJ finds that a treating source's opinion does not meet the standard for controlling weight, he must determine how much value the report does have based on a checklist of factors, including the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion. E.g., Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010). The ALJ must always provide "good reasons" for discounting a treating source's opinion. See, e.g., Bates v. Colvin, 736 F.3d 1093, 1101 (7th Cir. 2013); Scott v. Astrue, 647 F.3d 734, 739 (7th Cir. 2011).

Here, the ALJ evaluated Dr. Jayaprakash's report as follows:

22

The undersigned also gives little weight to the opinion of treating provider, Subbana Jayaprakash, M.D. Dr. Jayaprakash's assessment of the claimant would essentially render her unable to work. He opined the claimant would miss more than four days per month due to her impairments, should never engage in certain postural activities, has limitations in her manipulative activities, could only rarely lift less than ten pounds, sit and stand/walk for a total of less than two hours each day, is incapable of even low stress jobs, and can sit or stand for ten to fifteen minutes before requiring a position change. Dr. Jayaprakash's assessment of the claimant is based, in part, on his assumption of a tentative diagnosis with multiple sclerosis and rheumatoid arthritis. However, as set forth above, recently treating providers have refuted the presence of those conditions. Further, the excessive exertional limitations find no support in the physical examinations, which show good musculoskeletal and neurological function, including a normal gait and ability to heel and toe walk, full range of motion, preserved strength, and intact sensation.

(Tr. at 23, internal record citations omitted.) The ALJ instead relied on the opinions of Drs. Khorshidi, Musholt, Lefevre (in part), and Rao (in part) in determining RFC. (Tr. at 24.)

Plaintiff acknowledges that other providers concluded she probably did not have MS but argues that Dr. Jayaprakash's opinion was not contingent on such a diagnosis. She notes that different doctors can arrive at different diagnoses, and it does not necessarily follow that one diagnosis refutes another. Plaintiff further contends that Dr. Jayaprakash's opinion was based on the examinations and care he provided over a 2-½ year period. Finally, plaintiff faults the ALJ for failing to discuss several of the checklist factors in evaluating Dr. Jayaprakash's report.

As the Commissioner notes, however, plaintiff fails to address the ALJ's citation of contrary medical evidence, including some from Dr. Jayaprakash's own treatment notes. (Tr. at 23, citing Ex. 5F.) For instance, on November 10, 2011, Dr. Jayaprakash stated that plaintiff could not work and that he supported her application for social security disability. However, plaintiff's neurological and musculoskeletal examinations on that date were almost entirely normal. (Tr. at 351-54.) An ALJ may discount a doctor's report if it is inconsistent with the doctor's own treatment notes. See, e.g., Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007).

23

Plaintiff also fails to address the ALJ's reliance on the consultants who concluded that she had a greater work capacity. An ALJ may discount a treating source report if it is inconsistent with other medical opinions. See Hofslien v. Barnhart, 439 F.3d 375, 377 (7th Cir. 2006). Further, while Dr. Jayaprakash did not explicitly state that his opinion rested on the possible MS diagnosis, it was not unreasonable for the ALJ to note that other providers subsequently rejected that diagnosis. This was not an instance of the ALJ "playing doctor," as plaintiff alleges, but rather the ALJ considering the consistency of the report with the other medical evidence of record. See Knight, 55 F.3d at 314 ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence.").[5] Finally, an ALJ's decision need not be reversed just because he did not specifically discuss all of the regulatory factors for considering a treating source opinion. See, e.g., Schreiber v. Colvin, 519 Fed. Appx. 951, 959 (7th Cir. 2013).

In sum, I cannot find reversible error in the ALJ's rejection of Dr. Jayaprakash's opinion.

### III. CONCLUSION

Plaintiff requests a judicial finding of disability, but that is appropriate only if all factual issues have been resolved and the record clearly supports a finding of disability. Allord v. Astrue, 631 F.3d 411, 417 (7th Cir. 2011). This case must be remanded so that the ALJ may consider, in the first instance, whether plaintiff's alleged intellectual disability is a severe impairment and whether it meets Listing 12.05(C). The ALJ must also reconsider plaintiff's credibility under SSR 96-7p. See Campbell v. Shalala, 988 F.2d 741, 744 (7th Cir. 1993).

---

[5]The ALJ did not review the MRIs and other medical data in finding that plaintiff did not have MS; rather, he relied on the medical opinions of the doctors who reviewed that data. (Tr. at 14-15.)

24

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 9th day of November, 2015.

/s Lynn Adelman
LYNN ADELMAN
District Judge